IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| BDL International, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:05-0701-23 |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Sodetal USA, Inc. and Sodetal, S.A., | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

This matter is before the court upon motions filed by Defendants Sodetal, S.A. ("SO/FRANCE") and Sodetal USA, Inc. ("SO/USA"). SO/FRANCE moves to dismiss for (1) insufficiency of service, (2) lack of personal jurisdiction, (3) lack of subject matter jurisdiction, (4) failure to state a claim, and (5) improper venue based on comity and abstention doctrines. SO/USA moves to dismiss for (1) lack of subject matter jurisdiction, (2) failure to state a claim, and (3) improper venue based on comity and abstention doctrines. For the reasons set forth herein, the court grants leave for SO/FRANCE to re-file its motions once it has been served and denies SO/USA's motions.

## I. BACKGROUND

**A. The Parties**

SO/FRANCE is a steel manufacturer based in France and SO/USA is its wholly owned subsidiary incorporated in South Carolina. SO/USA produces steel core for radial ply tires and sells them to two large tire manufacturers. Plaintiff BDL International ("BDL") is an overland

1

freight forwarder[1] that also acts as a customs broker in Mount Pleasant, South Carolina. The company not only arranges and pays for inland freight for its clients, it also classifies inbound shipments and ensures that all customs paperwork is completed.

**B. Nature of the Case**

This matter involves the alleged non-payment of freight charges for ocean shipments sent from SO/FRANCE to SO/USA. SO/FRANCE contracted with a French export company named Thalatrans, SARL ("Thalatrans") for it to deliver SO/FRANCE's shipment of materials from France to the Port of Charleston ("Port"). Each shipment was covered by a bill of lading and waybills.[2] (Compl. ¶ 6.). The waybills listed Thalatrans as the "shipper" operating "on behalf of" Defendants. *See* Defs. Mot. Ex. 11 (listing the "shipper" as "Thalatrans P/C Sodetal"); Pl. Ex. A (stating that "P/C" translates to "on behalf of" in English). The waybills also named SO/USA as the consignee. SO/FRANCE paid Thalatrans to ship the containers to the Port while Thalatrans paid BDL for its services upon delivery. BDL would then provide customs brokerage services and arrange for the inland freight of the materials to SO/USA's facility in Fountain Inn, South Carolina.

In 2004, Thalatrans failed to pay BDL for its services on several shipments and by

---

[1] An overland freight forwarding company arranges for, coordinates, and facilitates cargo transport over land. *See Norfolk Southern Ry. v. James N. Kirby, Pty Ltd.*, 125 S. Ct. 385, 390 (2004).

[2] A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage. *Kirby*, 125 S. Ct. at 390. Waybills are documents acknowledging the receipt of goods by a carrier or by the shipper's agent and the contract for the transportation of those goods. Black's Law Dictionary 1623 (8th ed. 1999). Both bills of lading and waybills are considered contracts. *See id.*; *Indem. Ins. Co. of N. Am. v. Hanjin Shipping Co.*, 348 F.3d 628, 631 (7th Cir. 2003).

August, BDL began contacting Thalatrans and demanding that it pay its debt. Frustrated by the company's refusal to pay, BDL contacted SO/USA for help in getting its shipper to tender payment. After not receiving any payments, BDL informed SO/USA that it would not deliver anymore materials unless Thalatrans met its obligation. On October 22, 2004, Thalatrans filed for bankruptcy in France before satisfying the debt. In order for it to continue receiving shipments, SO/USA agreed to pay BDL on some of the outstanding invoices. Despite those payments, BDL was still left with unpaid fees and expenses.

On March 4, 2005, BDL sued SO/FRANCE and SO/USA for breach of a maritime contract and prayed for damages in the amount of $87,995.51.[3] Defendants filed separate Motions to Dismiss and submitted a joint memorandum in support on April 4, 2005. BDL responded on May 4, 2005, to which Sodetal replied on May 18, 2005. BDL sent a sur-reply on May 24, 2005.

## II. DISCUSSION

### A. SO/France

While BDL has served SO/USA, it has not served SO/FRANCE. As a result, Defendants request that the court stay a ruling on Defendants' motions until the French company as been served.[4] (Defs. Reply at 1-2.) BDL, however, objects by contending that Defendants' motions

---

[3] BDL does not seek payment relating to a single contract, but to a number of separate transportation agreements relating to specific shipments. (Pl. Surreply at 4.)

[4] Defendants argue that BDL had until July 3, 2005 to serve the French company, as that date marked the end of Federal Rule of Civil Procedure 4(m)'s 120 day time limit for service. The court, however, disagrees. While it governs domestic entities, Rule 4(m)'s time limit does not apply to foreign individuals or corporations. *See, e.g.*, *Flock v. Scripto-Tokai Corp.*, 2001 U.S. Dist. LEXIS 23881, *1, *14-15 (S.D. Tex. June 25, 2001) ("[C]ourts have consistently recognized that the 120-day time limit does not apply to service in foreign countries of

relating to subject matter jurisdiction, failure to state a claim, and comity are similar enough for the court to render its decision now.

Despite the similarity of the motions, the court lacks jurisdiction over SO/FRANCE until it has been served. *Koehler v. Dodwell*, 152 F.3d 304, 306 (4th Cir. 1998) (stating that "a failure to obtain proper service on the defendant deprives the court of personal jurisdiction over the defendant."). SO/USA has been served, however, and it would be proper and efficient for the court to rule on its motions now and make a finding as to the parent company later. As a result, the court denies Defendants request to stay and grants SO/FRANCE leave to re-file its motions upon service. The court now turns to SO/USA.[5]

---

individual or corporate defendants."). Accordingly, BDL can continue pursuing service of SO/FRANCE under the Hague Convention or "by any other internationally agreed means reasonably calculated to give notice." Fed. R. Civ. P. 4(f).

[5] While BDL has asked SO/FRANCE to waive service due to the costs of serving a foreign defendant, SO/FRANCE states that it will not comply. BDL argues that as a result, it should be entitled to the costs of such service as of right. While BDL would be correct if the company was a domestic corporation, it is incorrect as to SO/FRANCE because foreign defendants can fail to comply with a request to waive service and still avoid paying for service. *See* Fed. R. Civ. P. 4(d)(2) (imposing costs for effecting service only against "a defendant located within the United States," and not for foreign defendants); Fed. R. Civ. P. 4 advisory committee's notes (stating that there are no "adverse consequences to a foreign defendant" for failing to waive formal service because costs "apply only if the plaintiff and defendant are both located in the United States."); *O'Rourke Bros., Inc. v. Nesbitt Burns, Inc.*, 201 F.3d 948, 951 (7th Cir. 2000) ("Rule 4(d)(2) provides foreign defendants the ability to waive service but exempts them from costs for a failure to execute the waiver."); *Steinberg v. Quintet Publ'g Ltd.*, 1999 U.S. Dist. LEXIS 9729, *1, *6 (S.D.N.Y. June 29, 1999) (finding that the plaintiff could not recover costs for the foreign defendant's failure to waive formal service). Accordingly, BDL cannot recover costs for SO/FRANCE's failure to waive service of process.

**B. SO/USA**

### 1. Subject Matter Jurisdiction

When evaluating a motion to dismiss pursuant to Rule 12(b)(1), "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). The plaintiff has the burden of proving jurisdiction, and the court may go beyond the face of the complaint and consider evidence without converting the motion into one for summary judgment. *Richmond, Fredericksburg & Potomac R. Co. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991).

Defendants contend that the dispute does not involve a maritime contract, as the services rendered -- transporting cargo overland and acting as a customs broker -- do not invoke the court's jurisdiction. BDL, however, argues that all of the disputed shipments were covered by bills of lading and waybills and such transactions constitute maritime contracts, thereby granting the court admiralty jurisdiction. For the following reasons, the court finds for BDL.[6]

A federal court's admiralty jurisdiction is invoked if a contract is maritime in nature. 28 U.S.C. § 1333; *Simon v. Intercontinental Transport B.V.*, 882 F.2d 1435, 1442 (9th Cir. 1989) ("[A] contract must be wholly maritime in nature to be cognizable in admiralty."). A maritime contract relates to ships, to commerce or navigation on water, to transportation by sea, or to maritime employment. *See, e.g., J.A.R., Inc. v. M/V Lady Lucille*, 963 F.2d 96, 98 (5th Cir. 1992) ("A maritime contract is '[a] contract relating to a ship in its use as such, or to commerce

---

[6] BDL also handles air cargo shipped by Thalatrans. (Sodetal Aff. ¶¶ 1,2). BDL, however, complains only about its contracts relating to the ocean shipments and for purposes of this order, the court will consider only those contracts.

5

or navigation on navigable waters, or to transportation by sea or to maritime employment.'") (citation omitted); *Commercial Union Ins. Co. vs. Detyens Shipyards*, 147 F.Supp.2d 413, 419 (D.S.C. 2001).

To ascertain whether a contract is maritime, courts must look to the nature and character of the contract to determine whether it refers to maritime service or maritime transactions, not simply to whether the contract's formation or performance occurred on land or sea. *Norfolk Southern Ry. v. James N. Kirby, Pty Ltd.*, 125 S. Ct. 385, 393 (2004). ("[W]e cannot look simply . . . to the place of the contract's formation or performance. Instead, the answer depends upon . . . the nature and character of the contract, and the true criterion is whether it has 'reference to maritime service or maritime transactions'") (citation omitted); *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 608, 612 (1991) (stating that "in determining whether a contract falls within admiralty, the true criterion is the nature and subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions."). Moreover, services that are an essential and integral component of shipping commerce are maritime in nature. *Ingersoll Milling Mach. Co. v. M/V BODENA*, 829 F.2d 293, 302 (2d Cir. 1987) ("The procurement of the proper papers and documents relating to a shipment by sea is an essential and integral part of the shipping process; a contract to obtain those papers, therefore, falls squarely within the admiralty jurisdiction of the federal courts.").[7]

---

[7] A number of courts have noted the difficulty in determining whether a contract is maritime in nature. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 736 (1961) (stating that whether a contract invokes the federal courts' admiralty jurisdiction is particularly difficult, as "the boundaries of admiralty jurisdiction over contracts -- as opposed to torts or crimes -- being conceptual rather than spatial have always been difficult to draw."); *Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 301 (2d Cir. N.Y. 1987) (stating that "the precise categorization of the contracts that warrant invocation of the federal courts' admiralty

### *a. Transportation of Cargo Overland*

Defendants argue that BDL's services -- (1) the transportation of cargo overland and (2) the oversight of cargo entering the Port -- are land-based and thus the contracts are not maritime in nature. Despite Defendants' contentions, contracts involving primarily land-based services can be maritime. *See e.g.*, *Kossick v. United Fruit Co.,* 365 U.S. 731, 736 (1961) (holding that a shipowner's agreement with a seaman relating to his medical treatment was a maritime contract); *Empacardora Del Norte, S.A. v. Steiner Shipyard, Inc.*, 469 F. Supp. 954 (S.D. Ala. 1979) (finding a contract to repair a vessel on land to be maritime and within the court's admiralty jurisdiction).

Contracts involving the overland transport of goods have also been held to be maritime in nature. In *Norfolk Southern Ry. Co. v. Kirby*, 125 S.Ct. 385, 393 (2004), the United States Supreme Court found certain bills of lading to be maritime contracts where the services included transporting cargo by rail after its delivery by sea. In *Kirby*, an Australian manufacturing company sold ten containers of machinery to a plant owned by General Motors located right outside Huntsville, Alabama. *Id.* at 390. An ocean shipping company was contracted to transport the containers from Sydney, Australia to Savannah, Georgia, at which time Norfolk Southern Railroad (Norfolk) would transport the machinery from the Savannah port to Huntsville. *Id.* The Norfolk train, however, derailed en route, causing $1.5 million in damages

---

jurisdiction has proven particularly elusive."). As there is no bright line rule, courts look to precedent and reason by analogy in deciding whether the contract invokes jurisdiction. *See La Reunion Francaise SA v. Barnes*, 247 F.3d 1022, 1024 (9th Cir. 2001) (stating that there is no clear test for whether the subject matter of a contract is maritime; instead, courts look to precedent and reason by analogy.).

and resulting in a lawsuit between the Australian manufacturer's insurer and Norfolk. The Court held the disputed contracts to be maritime, as their primary objective was to transport goods from Australia to the United States by sea. The court reasoned that "the fact that the bills called for the journey's final leg to be by land [did] not alter the contracts' essentially maritime nature." *Id.* at 386-90.

Similarly, the parties here contracted for Thalatrans to ship SO/FRANCE's containers to the Port in order for BDL to arrange and pay for the overland transport of the freight to SO/USA. The primary objective of the contracts was to complete the transport of goods sent by sea from France to the United States. The fact that the delivery was sent overland does not alter the contracts' maritime nature. *See id.* at 386-90 (stating that the maritime nature of the contract "is not defeated simply because it also provides for some land carriage").

### b. *Custom Brokerage Services*

Moreover, BDL's custom brokerage services were also maritime in nature. The court in *Ingersoll Milling Mach. Co. v. M/V BODENA*, 829 F.2d 293, 302 (2d Cir. 1987) found a contract to be maritime where its services included "the preparation and processing of export declarations, delivery orders, dock receipts, bills of lading, and advance notifications of shipping . . . ." 829 F.2d at 301. The court found that such services were not just incidental to maritime interests but were "an essential and integral part of the shipping process." *Id.* at 302. Similarly, BDL's customs duties included classifying inbound shipments, processing the electronic payment of duties on behalf of Defendants, paying terminal handling charges, and ensuring that customs paperwork was completed. (Locklear Aff. ¶¶ 6-7.) These services were essential to the successful shipment of the materials, as without them, SO/FRANCE's materials

8

could never have entered into the country.

In response, Defendants cite *David Crystal, Inc. v. The Cunard S.S. Co., Ltd.*, 223 F. Supp. 273 (S.D.N.Y. 1963) for its holding that a customs brokerage contract was not maritime in nature. The court, however, did not rely on direct precedent and reached its decision based on law that has since been rejected. *Id.* at 293 ("The court has found no direct precedent holding a customs brokerage contract either within or without the jurisdiction of the admiralty."). First, as Defendants acknowledge, the decision was based in part upon an old *per se* rule excluding agency contracts from admiralty jurisdiction. (Defs. Reply at 6.) Moreover, the court also based its decision on Supreme Court precedent that looked primarily to location in determining whether a contract was maritime. 223 F. Supp. at 293 (stating that in determining admiralty jurisdiction over contracts, the correct inquiry examined "whether it was a maritime contract . . . to be performed upon the sea, or upon waters within the ebb and flow of the tide. . . . When placed against this background, the customs brokerage contract . . . is a contract made on land, to be performed on land, *Peoples Ferry Co. vs. Beers*, 61 U.S. 292, 402 (1858), and accordingly, its breach does not form a basis for admiralty jurisdiction.").

Since *David Crystal*, not only has the Supreme Court rejected the *per se* rule that agency contracts do not invoke the court's admiralty jurisdiction, *Exxon Corp. v. Cent. Gulf Lines*, 500 U.S. 603 (1991), the Court has also expanded the notion of what constitutes a maritime contract beyond an analysis of whether the contract's performance occurred on sea:

> While it may once have seemed natural to think that only contracts embodying commercial obligations between the "tackles" (i.e. from port to port) have maritime objectives, the shore is now an artificial place to draw a line. Maritime commerce has evolved along with the nature of transportation and is often inseparable from some land-based obligations.

9

*Kirby*, 125 S.Ct. 385, 394 (2004).  Understanding that *David Crystal* relied on outdated precedent is important because such reasoning produced results that run contrary to decisions rendered since then.  For example, the court noted that it had been held that a contract to procure insurance on a vessel was not within the court's admiralty jurisdiction.  *David Crystal*, 223 F. Supp. at 293 (citing *Warner v. Bear*, 126 F. Supp. 529 (D. Alaska 1955)).  Since that time, and after *Exxon Corp.* and *Kirby*, a federal district court in this circuit has found that a contract to procure insurance on a vessel *was* within the court's admiralty jurisdiction.  *Fernandez v. Haynie*, 120 F. Supp. 2d 575, 586 (E.D. Va. 2000).  The court rejected the old rule limiting maritime contracts to those performed at sea and found that maintaining a marine insurance policy was important to maritime commerce given the modern day realities of business.  *Id.* at 586 (stating that "modern day business realities make [maintaining a marine insurance policy] as much a necessary [to the vessel] as an anchor and propeller.").

Moreover, the fact that the United States Customs Service regulates the services highlight their importance to maritime commerce.  (Pl. Opp'n at 10); *cf. Kosak v. United States*, 465 U.S. 848, 859 (1984) (noting the Customs Service's duty in ensuring compliance with the nation's customs laws).  Due to the nature and character of the services and the Court's evolving understanding of admiralty jurisdiction, the court holds that BDL's contracts are maritime in nature and invoke the court's admiralty jurisdiction.  Accordingly, SO/USA's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) is denied.

### 2. Failure to State a Claim

Defendants assert that BDL entered into a contract specifically with Thalatrans, not SO/USA and as a result, no contract exists between the parties.  BDL, however, argues that

10

SO/USA was a consignee under the waybill and thus is liable for the unpaid invoices. *See* Defs. Mot. Ex. 11 (referring to SO/USA as "consignee"). Upon review of the record, the court agrees with BDL.

Contracts or bills of lading on which a party is named as a consignee bind that party to the agreement. The Supreme Court has noted that "the consignee is prima facie liable for the payment of the freight charges when he accepts the goods from the carrier." *Pittsburgh, C.C. & St. L. Ry. v. Fink*, 250 U.S. 577, 581 (1919); *Lousiville & N.R. R.R. Co. v. United States*, 267 U.S. 395, 397 (1925) ("The general rule is that, if a consignee accepts a shipment, he becomes liable as a matter of law for the full amount of freight charges."). The duties upon the consignee are significant, for as the Ninth Circuit Court of Appeals has noted "the most obvious indication of a consignee's implied agreement to pay freight charges occurs when he accepts the goods himself, indicating that they are his own and not the shipper's." *States Marine International, Inc. v. Seattle-First Nat'l Bank*, 524 F.2d 245, 248 (9th Cir. 1975)

Here, the waybills clearly refer to SO/USA as the consignee and the subsidiary contracted to accept the goods once BDL arranged for their shipment to Fountain Inn. (Pls. Ex. 11). Accordingly, SO/USA may be liable and the court denies Defendants' motion.

### 3. Improper Venue Based on Abstention, Comity, and *Forum Non Conveniens*

Finally, Defendants argue that pursuant to Rule 12(b)(3), BDL's complaint should be dismissed or stayed based on Thalatrans's bankruptcy proceeding in France. Defendants make the motion pursuant to common law principles of abstention, comity, and *forum non conveniens*. BDL, however, contends that the bankruptcy proceeding does not satisfy any of the principles. Upon review, the court finds for BDL.

### *a. Parallel Proceedings*

In the context of international abstention, courts weigh policies regarding international comity concerns, fairness to the litigants, and the efficient utilization of judicial resources. *Columbia Ins. Co. v. Brewer*, 1997 U.S. Dist. LEXIS 24120, *1, *13 (D.S.C. Mar. 21, 1997) ("Courts have weighed the policies favoring international respect or comity for foreign laws and judgments, fairness to the litigants, and the efficient utilization of judicial resources in resolving . . . motions [requesting international abstention]."). The threshold question, however, "in deciding whether . . . abstention is appropriate is whether there are parallel suits."[8] *Al-Abood v. El-Shamari*, 217 F.3d 225, 232 (4th Cir. Va. 2000); *Brewer*, 1997 U.S. Dist. LEXIS 24120 at *12 (D.S.C. Mar. 21, 1997) ("The threshold issue is whether the instant proceeding can be deemed to be, in some part, "parallel" to the Canadian litigation."). Suits are considered parallel if substantially the same parties litigate substantially the same issues in different forums. *Al-Abood v. El-Shamari*, 217 F.3d 225, 232 (4th Cir. Va. 2000). Abstention is rarely invoked and only under exceptional circumstances may a federal court order a stay or dismissal of an action to avoid duplicative litigation in a foreign country. *Moses H. Cone Mem. Hosp. v. Mercury Contstr. Co.*, 460 U.S. 1, 26 (1983); *Amsley v. West Virginia Racing Com.*, 378 F.2d 815, 818 (4th Cir. 1967) ("T]he doctrine of abstention is to be imposed sparingly, in rare circumstances . . . ."); *Brewer*, 1997 U.S. Dist. LEXIS 24120 at *12 (D.S.C. Mar. 21, 1997) ("Under certain exceptional circumstances, a federal district court may order a stay or dismissal of an action to avoid duplicative litigation in a foreign country.").

---

[8] Defendants specifically refer to *Colorado River* abstention, in reference to the United States Supreme Court's enunciation of the doctrine in *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800 (1976) (Defs. Mot. at 16.)

Here, contrary to Defendants' assertion, the bankruptcy proceeding and the lawsuit are not parallel, primarily because the issues involved in both are not the same. The French action concerns only the assets of the debtor Thalatrans and will not include issues important here, such as whether SO/USA is liable as consignee under the contract. *See* Pls. Amend. Opp'n at 16 (stating that one of the issues of the suit is the liability of SO/USA as consignee). SO/USA's liability to BDL as consignee is a question for this court to decide, not for a French bankruptcy court to answer. Accordingly, the claims are not parallel in a manner that would warrant abstention. *See McLaughlin v. United Va. Bank*, 955 F.2d 930, 934-35 (4th Cir. 1992) (stating that although the two actions involved similar claims and there were facts in common, the actions were not parallel because neither the parties nor the legal theories were the same); *New Beckley Mining Corp. v. International Union, UMWA*, 946 F.2d 1072, 1074 (4th Cir. 1991) (noting that "some factual overlap does not dictate that proceedings are parallel.").

### b. *International Comity Concerns, Fairness to the Parties, and Efficient Utilization of Judicial Resources*

Moreover, the court will not dismiss the suit based on principles of international comity. The Supreme Court defined comity as the "recognition which one nation allows within its territory to . . . judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protections of its laws." *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895). In reviewing comity concerns, courts will weigh the relative strengths of the foreign country's and host country's interests and determine whether to dismiss based on whose interests are stronger. *See, e.g., Brewer*, 1997 U.S. Dist. LEXIS 24120 at \*\* 15-17 (D.S.C. Mar. 21, 1997). Moreover, while

13

courts have long recognized principles of international comity, comity "remains a rule of practice, convenience, and expediency rather than of law." *Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 656 (D. Md. 1998).

Here, BDL is a sole proprietorship with a single office in Mt. Pleasant, South Carolina and SO/USA is a company incorporated in South Carolina. Any dispute occurring in South Carolina and dealing with the liability of the corporations will be important to this court. *Am. Motorists Ins. Co. v. CTS Corp.*, 356 F. Supp. 2d 583, 585 (W.D.N.C. 2005) (finding that a court has an interest in having localized controversies resolved at home). Upon review of Defendants' assertions, the court does not find the French court's interests in resolving all the claims made against Thalatrans to be stronger than this court's interests in adjudicating the dispute between citizen corporations. Moreover, the court holds that it will be fair to both companies to try the case here and finds that not abstaining will not be an inefficient use of judicial resources.[9] Accordingly, as there are no international comity, fairness, or judicial efficiency concerns, the

---

[9] Defendants briefly raised the doctrine of *forum non conveniens* in its discussion of fairness to the parties. (Defs. Mot. at 19.) The doctrine of *forum non conveniens* allows a district court, for the convenience of parties and witnesses and in the interest of justice, to transfer any civil action to any other district or division where it might have been brought. *V & S Vin & Sprit Aktiebalog v. Hanson*, 146 F. Supp. 2d 796, 799 (E.D. Va. 2001). As a general rule there is a strong presumption in favor of a plaintiff's choice of forum that must be overcome by the party seeking to invoke the doctrine, and dismissal is proper where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any reasons of convenience supporting his choice. *Amuru Japan v. Rabex Japan (In re Rabex Amuru, Inc.)*, 198 B.R. 898, 900 (Bankr. M.D.N.C. 1996); *Hanson*, 146 F. Supp. 2d at 799. Moreover, when the plaintiff is not a citizen or resident of the United States, the court's deference to the plaintiff's choice of forum is somewhat diminished. *Id.* Here, as two South Carolina corporations, BDL's chosen forum will not impose a heavy burden on SO/USA. Accordingly, SO/USA's motion is denied.

court denies SO/USA's motion.

## III.  CONCLUSION

It is, therefore,

**ORDERED,** for the foregoing reasons that Defendant Sodetal, S.A. is granted leave to re-file its motions once it has been served and Defendant Sodetal, USA, Inc.'s motions are **DENIED**.

**AND IT IS SO ORDERED.**


S/ Patrick Michael Duffy
**PATRICK MICHAEL DUFFY**
**UNITED STATES DISTRICT JUDGE**

**Charleston, South Carolina**
**July 21, 2005**